Thank you, Your Honor. I'm Don Lesser. I represent the Jamison plaintiffs. Is there anything different about this case once the other two have been argued, in fact? There is. Okay. Then why don't you focus on that? And perhaps I'll get to that. No, don't get to it. Tell us that and nothing else, because we already dealt with the rest. Sure. What's different about this case is that we are focused not so much on the temporal relationship of the various activities to whether there was professional services or not. We're much more focused on the fact that when ePlanning bought this coverage, it bought a package. It bought a package of E&O coverage for risks arising out of its customer relationships. And it bought a D&O management liability policy that was to protect against the risks of acts and omissions in the course of managing the company. Now, there were two separate companies, correct? There were, if you're reading There were two companies, right? And the E&O was for ePlanning Securities? The E&O coverage was written for ePlanning Securities, which was the company that actually was the broker-dealer and one other affiliate. It did not insure the parent company, ePlanning, Incorporated, presumably because ePlanning doesn't I don't really see what difference it makes. You have, I mean, it's not at all unusual to have redundant coverage or to have mutually exclusive coverage. What do we know about how these two policies are related to each other? Well, what we alleged in our complaint, and this is another respect in which this is a different case, we allege extrinsic evidence in the complaint, including the negotiations that took place between the brokers leading up to the issuance of these two policies. And what we allege, among other things, is that there were negotiations during which the parties agreed that the purpose of the two policies combined was to provide comprehensive, seamless coverage for the financial risks that this company faces. Now, what did E&O not cover? It ran out of money, but other than that, what didn't it cover? The E&O policy did not cover the parent company. Okay. And so if you're to take, if we accept BRIT's interpretation of the professional services exclusion in the D&O policy, it leaves this huge gap in coverage for the parent company because ePlanning, Inc. is left without any coverage. Well, did ePlanning, Inc. actually literally sell this stuff, or was it a subsidiary? No, it was a holding company. Right. So presumably they thought they wouldn't get sued because they weren't the people who were doing it. Well, but they were the company that was, the corporation that was doing it. Well, but they, again, as we allege in the complaint, the negotiations focused, among other things, on ensuring that the holding company would have coverage for management-related risks related to the activities of the broker-dealer, such as control person liability and other secondary liability that it, as the holding company and its directors and officers, would face. I mean, the fact is, if they hadn't run out of the policy, there would have been  No, Your Honor, the holding company would not have. I understand there wouldn't have been coverage of the holding company, but you wouldn't have needed coverage of the holding company. Well, depending on the fortuity of the policy limits of the E&O coverage, that might be right, but But the E&O coverage is what, 5 million? I believe that's right. Right. So my point is that if you, the question that we've been talking about throughout these proceedings is, what is the limit on this elastic phrase, in connection with? And Judge Berzon, you suggested, perhaps facetiously, that there may not be an answer to the question. I would submit that there is. I didn't say that. I said that it's hard to know what a set of phrases would be, but I'd like to hear one. Sure. Our position is that the phrase, in connection with, is limited by the reasonable expectations of the coverage that is expected by the policyholder based on the insuring agreement. That's the law in California on the construction of exclusions. And if you look at the breadth of the coverage in the D&O policy, it covers, it's very, very broad. It's any wrongful act committed by the individuals in their capacities as directors and officers. And for the company itself, it's any act or omission in connection with a securities claim. Very broad. And so the question then becomes, is this exclusion, can it be construed so broadly as to eliminate coverage for the holding company, which isn't insured under that E&O policy? Can it be construed to eliminate a huge chunk of coverage for this holding company for the control person liability and the other? Well, I mean, the kind of coverage that is essentially, you know, traditional D&O coverage is coverage for acts committed by officers and directors in their capacity as officers and directors to the injury of the company, essentially. And it appears that that's what this was mostly about, this was about. Your Honor, respectfully, I disagree, because this policy and the more modern policies, typically called management liability policies, also have a separate insuring agreement for the liability faced by the company itself. And that's coverage C of this policy. It provides coverage for the holding company and for the subsidiaries for their liability for securities claims. Now, the problem with construing in connection with as broadly as Britt wants to is that it wipes out that coverage for the holding company. A holding company is left without any coverage for the claims alleged in the underlying case involving control person liability. How do you have control person liability? You have control person liability based on the acts and omissions of your directors and officers. You said C. Where's C? Oh, I see. No, I don't. Yes, I do see. Okay. No, I actually don't. Sure. Where is this management coverage you're talking about? Let me have one moment. You're talking about the policy now? Yes, the policy. Yes. If you go to page 143 of the record. Just tell me the part, the section of the policy. It's in section 1, insuring clauses. Yes. If you look at C, underwriters shall pay on behalf of the company loss resulting from any claim first made against the company during the policy period for a corporate act. Okay. And then if you go to the definition of corporate act on the next page, at the top you see that it's defined as any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by the company involving a securities law violation. Okay. Thanks. So the question then becomes, and this is really, I would submit, the key question that was before the trial court and it's before this court. BRIT has its interpretation. It's very broad. In our view, it defeats the reasonable expectations of the policyholder, as I've explained. The question then becomes. Just to go back to your point then. The company can certainly commit securities fraud violations on its own behalf, i.e., selling securities of itself, for itself, without complying with the securities law, right? It can, yes. Right. So it's not, again, we don't have a no-class problem. Well, Your Honor, let me speak to that, because unfortunately I think there's been some confusion in the briefing throughout this case about this issue of how the exclusion affects the coverage that's afforded by the insuring agreements. The issue here is not, we're not claiming that this coverage was illusory in the sense that there was nothing left. That's not what we're claiming and that's not the argument here. The argument is that in determining what the policyholder's reasonable expectations are, you look to how extensively an exclusion takes away what the insuring agreement otherwise provides. And if it takes away so much, and this is what the Court addressed in this geotech case, if it takes away so much of the coverage that it defeats the insurer's reasonable expectations, and it does so through an exclusion that does not, that is not conspicuous, plain, and clear in its warning to the policyholder that this exclusion is going to be applied not just to defeat coverage for the holding, in the directors and officers of the holding company itself somehow get involved in providing the services provided by the broker-dealer, but if the exclusion is going to be construed so broadly that it's also going to defeat coverage for the holding company's control person liability and the control person liability of its directors and officers, under California law, that exclusion has to be much more specific, plain, and clear than this one is. This one doesn't give a layperson, and that's the way we interpret policies. This exclusion doesn't tell a layperson that the broad coverage that's extended by the DNO policy insuring agreements is going to be carved back. Kagan. What do we know, if anything, about what the cost of this policy was? It was $27,000, which, by the way, which in the year the holding company bought the policy was about, I think, two-thirds of its total cash on hand at that time. Yeah, but it was a holding company. But $27,000 is not very much for a policy to cover what you're claiming it covers. Well, I think you have to look at the limits. The limits were fairly low. Which were? I think they were $5 million. $5 million. I can check really quickly. $2 million. Thank you. Yeah. So it only provided $2 million in coverage. So that means that, given the fact that we have three different groups of claimants, everybody's going to get peanuts, even if they get the $2 million. Well, that was certainly one of the problems. But it is a problem. It remains a problem, right? Even if you got the whole $2 million, no one's getting much money. Right. No, that's right. Your Honors, I see that I have three minutes left, so I'd like to reserve the rest for rebuttal, if I may. That's fine. Thank you. Good morning, Your Honors. Michael Fox on behalf of BRIT. And, again, I don't think I need to rehash the arguments which we've made with regard to the case. Well, here's the question I'm left with. Okay? In the other two cases we had, we seemed to have a hard time deciding what the limits of inconnection were. And we had some issues about what for the benefit of means, both of which suggests that there's some ambiguity. And now we've had somebody tell us something, some class of extrinsic evidence that he says might be relevant to resolving that. Let's leave aside whether we think it's ambiguous or not. Would that class of extrinsic evidence be relevant to anything if we had it? No, because it doesn't lead to an interpretation to which the policy language is reasonably susceptible, which is the standard which the Ninth Circuit and California courts apply, meaning they can't, the extrinsic evidence which they claim might exist can't add or vary to the terms of the policy. It can't destroy the mutual. It can't do that. But that's just another way of saying it's unambiguous. I'm saying, I'm just going to assume it's ambiguous. All right? If he came up with evidence that there were negotiations here and that the understanding resulting understanding was that the two policies together would provide sort of wall coverage for essentially fraudulence or breaches of fiduciary duty in the sale of securities to third parties by anybody in the, any of the corporations involved, would that be pertinent evidence? It wouldn't because, again, it goes to whether the policy language itself, even if there's some alleged ambiguity, is reasonably susceptible to that, to that interpretation, which is creating this carve-out for one of the three insured entities when there's no language in the policy that suggests that it is. Well, if we had that evidence, would we then say, well, in connection with must be pretty narrow, or would we say, well, for the benefit of must not be meant to cover, you know, outright frauds? Well, again, the point which they're making doesn't go towards whether or not it covers those acts. It goes to whether or not the parent company has coverage or not for the acts of the subsidiary. And the language of the exclusion regarding that is clear and unmistakable, meaning that it's when a, the one, if there's an act by the company, the exclusion applies to all three. An act by the subsidiary is going to bar coverage for the parent company. And that part is clear and unmistakable. But the reason it matters, I gather, is that the subsidiaries were covered by the other policy with regard to the matters in dispute here. And there's no dispute about that. Correct. Well, they were covered under the EO policy. They were just out of money. And the allegations that they ran out of money, that's correct, Your Honor. But, again, as you pointed out, or as the panel pointed out, there was no, there should not have been any issue as to whether ePlanning Inc. was going to be sued for the sale of securities or for advisory services. But, again, if it was going to be sued for its management or control over its subsidiaries, there's a clear and unmistakable language in the policy which indicates that that entity is not going to get coverage. And, again, so going to your point about what the extrinsic evidence would do, it would go to vary the terms of whether the one, two, or three companies get coverage here, which is not what the language of the policy would be reasonably susceptible to. They're essentially breaking up company and telling you that based on a different company or a different insured which is seeking coverage is going to lead to differing meanings of in connection with. And that's, again, two points. In connection with the advisory services that the subsidiaries were providing is clear and unmistakable. The company and the coverage and the exclusions for the company is clear and unmistakable. And, again, there is no wipeout of coverage if there are risks by which the parent company was seeking coverage for. The trial court in Britt and even the panel here has noted that there is coverage for e-planning for certain acts which are not going to be excluded by the partial professional services exclusion. The point, though, is that those acts aren't at issue here. Those acts weren't alleged. They aren't part of the underlying claims. They aren't part of the underlying allegations for which e-planning and GWITI sought coverage under the DNO policy. Anything else? Your Honors, I'm happy to address any other questions you have, but I believe we've addressed most of the points in all three of these cases. I certainly appreciate your time, but if you have no other questions, I think we've addressed everything in our briefing in here today. Okay. You had some time for rebuttal? Briefly, yes. Thank you. Your Honor, focused on the question of the effect of the extrinsic evidence on whether the motion to dismiss should have been granted and whether this should be remanded, let's be clear. Under California law, an exclusion can be ambiguous even if it has a literal meaning that in itself seems very clear. In other words, it is not you don't do violence to the policy terms. You don't violate the parallel evidence rule just because in interpreting a provision differently than its literal terms, you have to import some language. Okay. But you've given us one example of a kind of evidence you might be able to have. Is it relevant to our decision whether it will allow the extrinsic evidence, whether you've proffered any evidence that could be relevant? Well, it's relevant in the sense that under the law. Well, no. I'm asking a predecessor question first. Sorry. In our deciding whether or not to remand for discovery of extrinsic evidence, do you first have to give us some notion of what your extrinsic evidence might be? In other words, can I say, all right, tell me what extrinsic evidence you might come up with, and then I get to say, well, that wouldn't matter, that wouldn't matter, or do we just say, well, there may be out there in the world something, so therefore we remand? Well, no. You, and I think you wouldn't remand just if I were standing here speculating about some evidence that's out there. All right. So I think that's probably true. So therefore, tell me why the evidence that you suggested might solve anything. All right. What we allege in the complaint is that in the negotiations, the parties agreed that the two policies taken together were to provide comprehensive coverage for the legal liabilities of the holding company and its subsidiaries and their DNOs. We also alleged that there were agreements during the negotiations that the partial professional services exclusion would apply narrowly so as to ensure that the policy would cover the holding company's liability for securities law violations, including liability related only indirectly to professional services rendered by the broker-dealer. There was also an agreement during the negotiations. And the reason it's related only indirectly is because it's managerial? Correct. As long as they're not selling it. I wouldn't go that far. And we get into the distinction to some extent in our briefs. But the directly, we think that the exclusion can be reasonably construed to treat as in connection with not just the selling, but the accompanying advice, the handling of the funds, and related activities having to do with the professional services that are actually defined in the policy. Indirect. Well, no professional services are defined in a policy. I mean, the professional services language isn't defined in a policy. It is defined in the E&O policy. And one of the other elements of extrinsic evidence, we allege, is that the parties agreed that it would have the same meaning for purposes of both policies. Okay. Indirect, an indirect connection with, on the other hand, would be what's ensured under the D&O policy, acts of management, not of selling, not of customer relationships, acts of managing the holding company, acts of managing the broker-dealer, that are not directly involved in providing client services. So, for example, acts or omissions by the holding company and its board that gave rise to the alleged control person liability, their alleged failure to do anything about the problems after having been notified of them and thereby having ratified that conduct, all of those allegations which are alleged in the early parts of the complaint and which are asserted as control persons. Do you provide any suggestion about how you're going to prove any of this? These agreements? The extrinsic evidence? Yes. Sure. It will come out of the – it will come from depositions and testimony of the brokers. As to actual things that were said in actual negotiations. The brokers and the underwriters involved in the negotiations. Is there anything in the record that suggests whether this language was created for this purpose or whether it was standard language? Discovery would tell us. There's nothing in the record that does. It was added as an add-on, right? The endorsement? No, the – yeah, the exclusion was added as an add-on. It was added by endorsement. That's correct. I will say that after thorough research, we have been unable to come up with another endorsement on any sort of an online search for a partial professional services exclusion other than ones issued by the London Market. By what? By the London Market, by Britt and others writing through Lloyds. Okay. Anything else? Okay. Thank you. Thank you, Your Honor. Thank you. We appreciate all your arguments on these cases, and the matters are submitted. We're going to take a recess while we transition from this panel to another panel.
judges: Morris, Paez, Berzon